Slip Op. 19-105

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| HYUNDAI HEAVY INDUSTRIES CO., LTD., | |
| Plaintiff, | |
| and | |
| HYOSUNG CORPORATION, ILJIN ELECTRIC CO., LTD., | |
| Consolidated Plaintiffs, | Before: Mark A. Barnett, Judge<br>Consol. Court No. 18-00066 |
| v. | **PUBLIC VERSION** |
| UNITED STATES, | |
| Defendant, | |
| and | |
| ABB INC., | |
| Defendant-Intervenor. | |

## <u>OPINION AND ORDER</u>

[Remanding the U.S. Department of Commerce's final results of the fourth administrative review of the antidumping duty order on large power transformers from the Republic of Korea.]

Dated: August 5, 2019

<u>David E. Bond</u>, White & Case LLP, of Washington, DC, argued for Plaintiff.  With him on the brief were <u>William J. Moran</u> and <u>Ron Kendler</u>.

<u>Henry D. Almond</u>, Arnold & Porter Kaye Scholer LLP, of Washington, DC, argued for Consolidated Plaintiff Hyosung Corporation.  With him on the brief were <u>J. David Park</u>, <u>Daniel R. Wilson</u>, and <u>Leslie C. Bailey</u>.

Amrietha Nellan and Jeffrey Winton, Law Office of Jeffrey M. Winton PLLC, of Washington, DC, argued for Consolidated Plaintiff ILJIN Electric Co., Ltd.

John J. Todor, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant.  With him on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, L. Misha Preheim, Assistant Director, and Kelly A. Krystyniak, Trial Attorney.  Of counsel on the brief was David W. Richardson, Senior Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

Melissa M. Brewer, R. Alan Luberda, and David C. Smith, Kelley Drye & Warren LLP, of Washington, DC, argued for Defendant-Intervenor, ABB Inc.

Barnett, Judge: In this action, Plaintiffs Hyundai Heavy Industries Co., Ltd. ("HHI" or "Hyundai"),[1] Hyosung Corporation ("Hyosung"),[2] and Iljin Electric Co., Ltd. ("Iljin") contest the U.S. Department of Commerce's ("Commerce" or "the agency") final results of the fourth administrative review ("AR4") of the antidumping duty order on large power transformers ("LPTs") from the Republic of Korea ("Korea").  *See Large Power Transformers From the Republic of Korea*, 83 Fed. Reg. 11,679 (Dep't Commerce Mar. 16, 2018) (final results of antidumping duty admin. review; 2015-2016) ("*Final Results*"), ECF No. 19-5, and accompanying Issues and Decision Mem., A-580-867 (Mar. 9, 2018) ("I&D Mem."), ECF No. 19-6.[3]  In lieu of filing a response brief, Defendant, United States

---

[1] Hyundai Electric & Energy Systems Co., Ltd. is the successor-in-interest to HHI. Letter from David E. Bond, Attorney, White & Case LLP, to the Court (Sept. 12, 2018), ECF No. 32.

[2] Effective June 1, 2018, Hyosung changed its name to Hyosung Heavy Industries Corporation.  Confidential Mem. in Supp. of Hyosung's Mot. for J. Upon the Agency R. ("Hyosung's Br.") at 1 n.1, ECF No. 26-1.

[3] The administrative record is divided into a Public Administrative Record ("PR"), ECF No. 19-4, and a Confidential Administrative Record ("CR"), ECF Nos. 19-2, 19-3. Parties submitted joint appendices containing record documents cited in their briefs.  *See* Public J.A., ECF Nos. 61-1 (Vol. I), 61-2 (Vol. II), 61-3 (Vol. III), 61-4 (Vol. IV); Confidential J.A.

("the Government"), on behalf of Commerce, filed a motion requesting remand of "this

matter in its entirety."  Def.'s Mot. for Voluntary Remand at 1, ECF No. 39.  Defendant-

Intervenor, ABB Inc. ("ABB"), urges the court to sustain the *Final Results* in their

entirety.  *See* Confidential Def.-Int.'s Resp. in Opp'n to Pl.'s and Consol. Pls.' Mots. for

J. on the Agency R. ("ABB's Resp."), ECF Nos. 49, 49-1; Order (Jan. 28, 2019), ECF

No. 53 (granting ABB's motion for errata).

## Procedural Background

On August 5, 2016, Commerce issued a Federal Register notice regarding the

opportunity to request an administrative review of the antidumping duty order on LPTs

from Korea for the period of review covering August 1, 2015, through July 31, 2016.

*Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation;*

*Opportunity to Req. Admin. Review*, 81 Fed. Reg. 51,850, 51,851 (Dep't Commerce

Aug. 5, 2016), PR 1, CJA Vol. III, Tab 3.  On October 14, 2016, Commerce initiated

AR4, identifying HHI, Hyosung, and Iljin as companies subject to the review.  *Initiation*

*of Antidumping and Countervailing Duty Admin. Reviews*, 81 Fed. Reg. 71,061, 71,063

(Dep't Commerce Oct. 14, 2016), PR 6, CJA Vol. III, Tab 6.  Commerce selected

---

("CJA"), ECF Nos. 60-1 (Vol. I), 60-2 (Vol. II), 60-3 (Vol. III), 60-4 (Vol. IV).  Parties also
submitted supplemental record documents pursuant to the court's request.  *See*
Confidential Resp. to Court's June 5, 2019 Order (June 6, 2019) ("Suppl. CJA"), ECF
No. 69, & Attachs. 1-8, ECF Nos. 69-1—69-6, 70-1—70-3; Confidential Resp. to
Question 6 of the Court's June 5, 2019 Order (June 7, 2019), ECF No. 72, and Attach. 1
("Sales Representative Agreement"), ECF No. 72-1.  The court references the
confidential versions of the relevant record documents, unless otherwise specified.

Hyosung and HHI as mandatory respondents for individual review.   Respondent

Selection Mem. (Jan. 3, 2017) at 5-6, PR 22, CJA Vol. III, Tab 8.

For the preliminary results, Commerce assigned Hyosung and HHI weighted-

average dumping margins of 60.81 percent based on the use of total adverse facts

available (otherwise referred to as total "AFA").   *Large Power Transformers From the*

*Republic of Korea*, 82 Fed. Reg. 42,289, 42,290 (Dep't Commerce, Sept. 7, 2017)

(prelim. results of antidumping duty admin. review; 2015-2016) ("*Prelim. Results*"), PR

263, CJA Vol. III, Tab 9.[4]   Because both individually-examined companies were

assigned a 60.81 percent margin, Commerce selected this same rate for companies not

selected for individual examination (including Iljin).   *Id.* at 42,290 & n.4 (citing *Albemarle*

*Corp. v. United States*, 821 F.3d 1345 (Fed. Cir. 2016)).

Commerce made no changes to its determination in the *Final Results*.   *Final*

*Results*, 83 Fed. Reg. at 11,679; I&D Mem. at 3.   Commerce based its decision to use

total AFA with respect to Hyosung on three collective findings.   Commerce found that

Hyosung failed to: (1) separately report service-related revenues; (2) explain an invoice

that covered multiple sales over multiple review periods; and (3) report all price

---

[4] Commerce selected the 60.81 percent rate because it was the AFA rate assigned to
HHI in the third administrative review ("AR3").   Decision Mem. for the Prelim. Results of
Antidumping Duty Admin. Review (Aug. 31, 2017) ("Prelim. Mem.") at 6 & n.22, PR 260,
CJA Vol. III, Tab 10 (citing *Large Power Transformers from the Republic of Korea*, 82
Fed. Reg. 13,432 (Dept. Commerce Mar. 13, 2017) (final results of antidumping duty
admin. review)).   In AR3, Commerce selected the 60.81 percent margin from the
petition.   *See* Issues and Decision Mem. for the Final Results of the Admin. Review of
the Antidumping Duty Order on Large Power Transformers from the Republic of Korea,
A-580-867 (Mar. 6, 2017) at 6, *available at* https://enforcement.trade.gov/frn/summary/
korea-south/2017-04824-1.pdf (last visited July 31, 2019).

adjustments and discounts.  I&D Mem. at 25-32.  Pursuant to 19 U.S.C.

§ 1677e(a)(2)(A) and (C), Commerce found that Hyosung "withheld information

requested by Commerce and otherwise impeded the review," such that the use of "facts

otherwise available" was authorized.  *Id.*; *see also* 19 U.S.C. § 1677e(a).  Additionally,

Commerce found that Hyosung "failed to cooperate to the best of its ability" when

responding to Commerce's information requests concerning these three issues and

applied an adverse inference pursuant to 19 U.S.C. § 1677e(b) when selecting the facts

otherwise available.  I&D Mem. at 4, 29, 31, 32.

Commerce based its decision to use total AFA with respect to HHI on three other

findings.  Commerce found that HHI failed to correctly report prices and costs for

"accessories," understated the gross unit price for certain home market sales, and failed

to disclose an affiliated sales agent.  *Id.* at 9-19.  Commerce found that HHI "withheld

requested information and otherwise impeded this review," I&D Mem. at 4, such that the

use of use of "facts otherwise available" was warranted, *id.*; *see also* 19 U.S.C.

§ 1677e(a).  Commerce determined that HHI also failed to cooperate to the best of its

ability when responding to Commerce's information requests on the three identified

issues and applied an adverse inference to its selection of the facts otherwise available.

I&D Mem. at 4, 14, 18, 19.  Commerce did not change the rate assigned to companies

not selected for individual examination in the *Final Results*.  *Id.* at 35.

HHI, Hyosung, and Iljin commenced this action to dispute various aspects of Commerce's *Final Results*[5] and ABB intervened as Defendant Intervenor.  Order (Apr. 24, 2018), ECF No. 15.  Specifically, HHI challenges Commerce's decision to use total AFA to determine HHI's dumping margin, including each of the three bases underlying that decision.  *See* Confidential Rule 56.2 Mot. for J. on the Agency R. on Behalf of Pl. Hyundai Heavy Industries Co., Ltd., ECF No. 29, and Confidential Mem. of P. & A. in Supp. of Pl.'s Rule 56.2 Mot. for J. Upon the Agency R. ("HHI's Br."), ECF No. 29-1; Confidential Reply in Supp. of Pl.'s Rule 56.2 Mot. for J. Upon the Agency R. ("HHI's Reply"), ECF No. 58.  Hyosung likewise challenges Commerce's decision to use total AFA to determine Hyosung's dumping margin and each of the three bases upon which Commerce relied to reach that decision.  *See* Hyosung's Br.; Confidential Hyosung's Reply Br. in Supp. of its Rule 56.2 Mot. for J. Upon the Agency R. ("Hyosung's Reply"), ECF No. 55.  Iljin challenges Commerce's method of selecting the rate assigned to Iljin. *See* Mot. of Pl. Iljin Electric Co., Ltd. for J. on the Agency R., ECF No. 24, and Rev. Br. of Iljin Electric Co., Ltd. in Supp. of its Rule 56.2 Mot. for J. on the Agency R. ("Iljin's Br."), ECF No. 25; Reply Br. of Iljin Electric Co., Ltd. ("Iljin's Reply") at 2, ECF No. 54.[6]

---

[5] HHI, Hyosung, and Iljin filed separate actions challenging the *Final Results*.  *See* Summons, ECF No. 1; *Hyosung Corp. v. United States*, No. 18-cv-00067 (Ct. Int'l Trade filed Apr. 2, 2018); *ILJIN Electric Co., Ltd. v. United States*, No. 18-cv-00075 (Ct. Int'l Trade filed Apr. 10, 2018).  On May 10, 2018, the court consolidated the three actions into lead case number 18-00066.  Docket Entry (May 10, 2018), ECF No. 17.
[6] The court provides further factual background relevant to each pending motion in the Discussion section below when helpful to the analysis.

JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to § 516A(a)(2)(B)(iii) of the Tariff Act of

1930,[7] as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012), and 28 U.S.C. § 1581(c).

The court will uphold an agency determination that is supported by substantial evidence

and otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i).

DISCUSSION

**I.   The Government's Motion for Remand**

    **A.  Legal Framework**

When an agency determination is challenged in the courts, the agency may

"request a remand (without confessing error) in order to reconsider its previous position"

and "the reviewing court has discretion over whether to remand."  *SKF USA Inc. v.*

*United States*, 254 F.3d 1022, 1029 (Fed. Cir. 2001) (citations omitted).  Remand is

appropriate "if the agency's concern is substantial and legitimate," but "may be refused

if the agency's request is frivolous or in bad faith."  *Id.*  "A concern is substantial and

legitimate when (1) Commerce has a compelling justification, (2) the need for finality

does not outweigh that justification, and (3) the scope of the request is appropriate."

---

[7] All citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and references to the U.S. Code are generally to the 2012 edition. However, The Trade Preferences Extension Act ("TPEA"), Pub. L. No. 114–27, § 502, 129 Stat. 362, 383–84 (2015), made several amendments to the antidumping and countervailing duty laws. Section 502 of the TPEA amended 19 U.S.C. § 1677e.  *See* TPEA §§ 502.  The TPEA amendments affect all antidumping duty determinations made on or after August 6, 2015.  *See* Dates of Application of Amendments to the Antidumping and Countervailing Duty Laws Made by the Trade Preferences Extension Act of 2015, 80 Fed. Reg. 46,793 (Dep't Commerce Aug 6, 2015).  Accordingly, all references to 19 U.S.C. § 1677e are to the amended version of the statute.

*Changzhou Hawd Flooring Co., Ltd. v. United States*, 38 CIT __, __, 6 F. Supp. 3d 1358, 1361 (2014) (citations omitted).

### B. Parties' Contentions

The Government requests a remand of "this matter in its entirety" to Commerce, Def.'s Mot. for Voluntary Remand at 1, so that the agency may "reconsider or further explain" its decisions to use total AFA with respect to HHI and Hyosung and its decision to assign Iljin "the average rate of the two mandatory respondents," *id.* 4.  The Government provides two justifications for the remand request.  It states that Commerce's findings with respect to HHI's reporting of accessories overlap with the court's recent remand order in *Hyundai Heavy Industries, Co. Ltd. v. United States*, 42 CIT __, 332 F. Supp. 3d 1331 (2018).[8]  *Id.* at 4.  Additionally, it contends, Commerce's findings with respect to Hyosung's alleged failure separately to report service-related revenues overlaps with the court's recent remand order regarding HHI's reporting of service-related revenue in *ABB Inc. v. United States ("ABB II")*, 42 CIT __, 355 F. Supp. 3d 1206 (2018), *reconsideration denied*, 43 CIT __, 375 F. Supp. 3d 1348 (2019).[9]  *Id.*

HHI and Hyosung oppose the Government's remand request, arguing that it does not encompass all the issues raised in their respective complaints.  *See* Resp. of Pl. Hyundai Heavy Industries Co., Ltd. to Def.'s Mot. for Voluntary Remand ("HHI's Resp.

---

[8] *Hyundai Heavy Industries* concerned Commerce's final results in AR3, which covered the August 1, 2014, through July 31, 2015, period of review.  332 F. Supp. 3d at 1334.
[9] *ABB II* concerned Commerce's remand results in the second administrative review ("AR2") of the antidumping duty order on LPTs from Korea, which covered the August 1, 2013, through July 31, 2014, period of review.  355 F. Supp. 3d at 1210.

to Mot. for Voluntary Remand") at 2, ECF No. 40; Resp. of Consol. Pl. Hyosung Corp. to

Def.'s Mot. for Voluntary Remand ("Hyosung's Resp. to Mot for Voluntary Remand") at

4, ECF No. 43.  They contend that a court decision addressing all issues on the merits

would better serve judicial efficiency.  HHI's Resp. to Mot. for Voluntary Remand at 3;

Hyosung's Resp. to Mot for Voluntary Remand at 5; *see also* Hyosung's Reply at 7

(arguing that "in the interest of finality and fairness," the court should "rule at this

juncture on the merits [of] the issues that Hyosung has raised").  ABB argues that the

Government has failed to demonstrate that the agency's concern is "substantial and

legitimate" because the Government did not address why the court's recent opinions

would cause Commerce to reconsider its findings regarding accessories and service-

related revenues, which findings were based on a distinct administrative record.  Def.-

Int. ABB Inc.'s Resp. in Opp'n to Def.'s Mot. for Voluntary Remand at 2, ECF No. 41.

Moreover, ABB argues that substantial evidence supports the *Final Results*, which are

otherwise in accordance with law, and the court should sustain them in their entirety.  *Id.*

at 1.

### C.  The Government's Motion for Remand is Denied

Remand is appropriate when Commerce has "a compelling justification," "the

need for finality does not outweigh that justification," and "the scope of the request is

appropriate."  *Changzhou,* 6 F. Supp. 3d at 1361.  In its motion, the Government does

not provide a compelling justification or clearly define the scope of the request that

would lead the court to conclude that Commerce's concern is substantial and legitimate.

The Government provides no explanation, let alone a compelling justification, why a

remand of this matter is appropriate based on the two issues it identified.  *See* Def.'s

Mot. for Voluntary Remand at 4.  Additionally, aside from stating that the accessories

and service-related revenues issues "overlap" with the court's recent opinions in AR3

and AR2, respectively, *id.*, the motion is devoid of any substantive discussion of the

similarities in the records of the three proceedings.  Merely requesting remand so the

agency can "reconsider its decision," without appropriate explanation, "is insufficient to

support a voluntary remand."  *Corus Staal BV v. U.S. Dep't of Commerce*, 27 CIT 388,

391, 259 F. Supp. 2d 1253, 1257 (2003) (internal quotation marks omitted).

        In response to questioning from the court, the Government provided additional

context for its remand request during oral argument.  The Government stated that it

requested the remand for Commerce to reconsider its decisions regarding accessories

and service-related revenues and consider whether the remaining issues justified the

use of total AFA.  Oral Arg. at 1:09:01–1:09:40 (reflecting the time stamp from the

recording).  The Government stated that it was unaware of any material differences

between the records of this review and AR3 concerning accessories or between the

records of this review and AR 2 concerning service-related revenues.  Oral Arg. at

11:57-12:31.  Moreover, it asserted that it requested the remand on the accessories

issue due to Commerce's remand redetermination in AR3, in which the agency

accepted HHI's method of reporting LPT accessories.  Oral. Arg. at 15:18-28.

        The Government's belated explanations notwithstanding, remand based solely

on the Government's request at this juncture is inappropriate because Plaintiffs and

ABB have fully briefed all issues, the court has heard oral argument, and the matter is

ripe for decision.  In light of the totality of the circumstances and the timing and scope of

the requested remand, the Government has failed to provide a compelling justification

for its request for remand.  *See Changzhou,* 6 F. Supp. 3d at 1361.  While the court is

nevertheless ordering remand, it is doing so based upon its evaluation of the arguments

of the parties, the record evidence, and the law.  Commerce's redetermination must be

conducted in light of the rulings provided herein.[10]

## II.    HHI's and Hyosung's Motions for Judgment on the Agency Record

### A.  Legal Framework for Facts Available and AFA

In antidumping duty proceedings, Commerce relies primarily on factual

information that interested parties submit during the course of the proceeding.  *See* 19

C.F.R. § 351.301(a).  When "necessary information is not available on the record," or an

interested party "withholds information" requested by Commerce," "fails to provide"

requested information by the submission deadlines, "significantly impedes a

proceeding," or provides information that cannot be verified pursuant to 19 U.S.C.

_____

[10] The Government filed the request for remand in lieu of filing a response brief and opted not to respond to Plaintiffs' remaining arguments.  ABB argues that, by requesting the remand "in its entirety," the Government has preserved its ability to defend the remaining bases upon which Commerce relied to use total AFA.  ABB's Resp. at 37.  It further contends that a finding that the Government has waived its right to defend Commerce's remaining findings would unfairly prejudice ABB, the prevailing party in the administrative proceeding.  *Id.* at 38.  The court previously determined that it will treat the Government's motion as its response brief.  Order (Jan. 14, 2019) at 3, ECF No. 46. While the Government failed to provide any substantive arguments in response to the Plaintiffs' briefs, the court's review is based on the administrative record; therefore, the court has considered the arguments made by Plaintiffs and Defendant-Intervenor when analyzing whether Commerce's decisions are supported by substantial evidence on the record and the legal bases reflected in the decisions are otherwise in accordance with law.

§ 1677m(i), Commerce "shall . . . use the facts otherwise available."  19 U.S.C.
§ 1677e(a).

Commerce's authority to use the facts otherwise available is subject to 19 U.S.C.
§ 1677m(c), (d), and (e).  Subsection (c) provides, *inter alia*, that when an interested
party informs Commerce promptly after receiving a request for information "that such
party is unable to submit the information requested in the requested form and manner,
together with a full explanation and suggested alternative forms," then Commerce "shall
consider the ability of the interested party to submit the information in the requested
form and manner and may modify such requirements to the extent necessary to avoid
imposing an unreasonable burden on that party."  *Id.* § 1677m(c)(1).  Subsection (d)
provides the procedures Commerce must follow when a party files a deficient
submission.  Pursuant thereto, if Commerce finds that "a response to a request for
information" is deficient, "[it] shall promptly inform the person submitting the response of
the nature of the deficiency and shall, to the extent practicable, provide that person with
an opportunity to remedy or explain the deficiency in light of the time limits established
for the completion of investigations or reviews."  *Id*. § 1677m(d).  If any subsequent
response is also deficient or untimely, Commerce, subject to subsection (e), may
"disregard all or part of the original and subsequent responses."  *Id.*  Pursuant to
subsection (e), Commerce

> shall not decline to consider information that is submitted by an interested
> party and is necessary to the determination but does not meet all the
> applicable requirements ... if—
> (1) the information is submitted by the deadline established for its
> submission,

(2) the information can be verified,
(3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination,
(4) the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by the administering authority or the Commission with respect to the information, and
(5) the information can be used without undue difficulties.

*Id.* § 1677m(e).

If, notwithstanding those restrictions, Commerce still lacks necessary information and determines that the party "has failed to cooperate by not acting to the best of its ability to comply with a request for information," Commerce "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." *Id.* § 1677e(b). "Compliance with the 'best of its ability' standard is determined by assessing whether a respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003). Before using adverse facts available, Commerce "must make an objective showing that a reasonable and responsible importer would have known that the requested information was required to be kept and maintained under the applicable statutes, rules, and regulations." *Id.* at 1382. Next, Commerce

must [ ] make a subjective showing that the respondent['s] . . . failure to fully respond is the result of the respondent's lack of cooperation in either: (a) failing to keep and maintain all required records, or (b) failing to put forth its maximum efforts to investigate and obtain the requested information from its records.

*Id.* at 1382–83.  "An adverse inference may not be drawn merely from a failure to

respond."  *Id.* at 1383.  Rather, Commerce may apply an adverse inference "under

circumstances in which it is reasonable for Commerce to expect that more forthcoming

responses should have been made."  *Id.*

>    Commerce uses

>    "total adverse facts available" administratively to refer to Commerce's
>    application of adverse facts available not only to the facts pertaining to
>    specific sales or information . . . not present on the record, but to the facts
>    respecting all of respondents' production and sales information that the
>    [agency] concludes is needed for an investigation or review.

*Nat'l Nail Corp. v. United States,* Slip Op. 19-71, 2019 WL 2537931, at *13 (CIT June

12, 2019) (citation omitted); *see also Deacero S.A.P.I. de C.V. v. United States*, 42 CIT

__, __, 353 F. Supp. 3d 1303, 1307 n.2 (2018) (Commerce uses "total AFA" when it

concludes "that all of a party's reported information is unreliable or unusable and that as

a result of a party's failure to cooperate to the best of its ability, it must use an adverse

inference in selecting among the facts otherwise available.").

   **B.  Hyosung's Motion**

      **i.  Relevant Facts**

   In Section C of its initial questionnaire, Commerce requested Hyosung to "[r]eport

each U.S. sale of merchandise entered for consumption during the POR," Req. for

Information Hyosung Corp. (Jan. 5, 2017) ("Hyosung Initial Questionnaire") at C-2, PR

25, CJA Vol. II, Tab 2, and gave instructions on reporting the price per unit for each

sales transaction and reporting the service-related revenues, *id.* at C-17, C-18.  For

instance, Commerce instructed Hyosung to report service-related revenues (e.g., ocean

freight revenue, inland freight revenue, etc.) in separate fields, "and identify the related expense(s) for each revenue." *Id.* at C-1.  Furthermore, it instructed: "If the invoice to your customer includes separate charges for other services directly related to the sale, such as a charge for shipping, create a separate field for reporting each additional charge." *Id.* at C-18.  Hyosung responded to Commerce's initial questionnaire in February 2017.  *See* Section A Questionnaire Resp. (Feb. 2, 2017) ("Hyosung Sec. A Resp."), CR 6-18, PR 34-41, CJA Vol. IV, Tab 7; Resp. of Hyosung Corp. to the Dep't's Jan. 5, 2017 Section C Questionnaire (Feb. 27, 2017) ("Hyosung Sec. C Resp."), CR 67, PR 94, CJA Vol. II, Tab 3.  Commerce subsequently issued supplemental questionnaires to Hyosung, to which Hyosung responded.[11]

For the final results, Commerce found that "despite multiple requests from Commerce," Hyosung failed to provide complete and accurate information with respect to service-related revenues.  I&D Mem. at 26 & nn.146-47 (citing Prelim. Mem. at 6-9). Commerce explained that although the initial questionnaire instructed Hyosung to create separate fields for reporting separate charges "if the invoice to [the] customer" included such charges, the instruction did not limit separate reporting to only charges that appear separately on the invoice.  See *id.* at 26-27.  Based on its review of certain Order Acknowledgment Forms ("OAFs" or "OAF," in singular) that Hyosung had

---

[11] *See, e.g.*, First Sales Suppl. Questionnaire (Apr. 12, 2017), CR 191, PR 120, CJA Vol. II, Tab 5; Suppl. Questionnaire Resp. (May 8, 2017), CR 274, PR 166, CJA Vol. II, Tab 6; Third Suppl. Questionnaire (May 26, 2017), CR 328, PR 177, CJA Vol. IV, Tab 9; Third Suppl. Questionnaire Resp. (June 21, 2017), CR 449-53, PR 216-18, CJA Vol. II, Tab 8, CJA Vol. IV, Tab 10.

provided in response to a supplemental questionnaire, Commerce found that Hyosung

dedicated a portion of the sales price that it charged the U.S. customer to cover service-

related expenses. *Id.* at 28.  To Commerce, the OAFs established that Hyosung's

service-related revenues exceeded the related expenses, and Hyosung should have

separately identified the service-related revenues based on the allocation in the OAFs

so that the revenues could be compared to, and capped by, the expenses.  *Id.* at 28-29

& n.167 (citing Analysis of Data/Questionnaire Resps. Submitted by Hyosung Corp. in

the Prelim. Results of the 2015-2016 Admin. Review of the Antidumping Duty Order on

Large Power Transformers from the Republic of Korea (Aug. 31, 2017) ("Hyosung

Prelim. Analysis Mem.") at 5, CR 555, PR 265, CJA Vol. IV, Tab 11).

Additionally, Commerce faulted Hyosung for failing to provide OAFs for all U.S.

sales made during the period of review and, for the sales for which it did provide them,

failing to include complete and legible OAFs.  I&D Mem. at 28-29 & nn.162, 170

(citations omitted); Prelim. Mem. at 7-9.[12]  Commerce also stated that, "due to

Hyosung's continued failure to report reliable information despite multiple requests to do

so, Hyosung failed to cooperate to the best of its ability."  I&D Mem. at 29; *see also id.*

at 26.

With respect to the invoice that covered multiple sales over multiple review

periods, Commerce had preliminarily determined that Hyosung provided one invoice for

---

[12] The OAFs were incomplete because they were missing a page and they contained
fields that were dark, making the values within them illegible.  Prelim. Mem. at 7 & n.33.

multiple sales, including one made during the previous period of review.  Prelim. Mem.

at 10; Hyosung Prelim. Analysis Mem. at 5-6.[13]  For the final results, Commerce

concluded that it was "unclear how multiple sales could be contained on one invoice"

given Hyosung's questionnaire response stating that, for U.S. sales, its affiliate[14] "issues

the invoice to the unaffiliated customer when the merchandise is delivered and/or site

test is completed."  I&D Mem. at 30 & n.181 (quoting Hyosung Sec. A Resp. at A-36).[15]

Commerce determined that Hyosung had "not explained this discrepancy, despite

multiple opportunities to clarify the record," and, therefore, "an adverse inference is

appropriate."  *Id.* at 30-31.

Regarding the price adjustments and discounts, Commerce found that Hyosung

failed to report certain price adjustments and interest revenue despite clear instructions

from Commerce to do so.  *Id.* at 31-32.  Commerce stated that failure to report

adjustments impeded its ability "to examine the veracity of each claimed adjustment, []

the validity of the reported price," and "the level of trade between the respondent and its

customers."  *Id.* at 32.  Additionally, failure to report interest revenue impeded

Commerce's ability to analyze the reported prices and the sales process.  *Id.*

---

[13] Specifically, Hyosung reported invoice number [[          ]] as the invoice covering
SEQUs [[        ]].  Hyosung Prelim. Analysis Mem. at 6 & n.40 (citing Suppl. Section A
Resp. (May 8, 2017) at Ex. S-1, Suppl. CJA, Attach. 6).  According to ABB, the same
invoice covered "SEQU [[   ]] from the previous [period of review]."  *Id.*
[14] HICO America Sales Technology, Inc. ("HICO America") is Hyosung's wholly-owned
U.S. affiliate.  Hyosung Sec. C Resp. at C-2.
[15] Elsewhere in its initial questionnaire response, Hyosung explained that "[s]ome
invoices are divided and issued separately to its unaffiliated customer.  In this case,
Hyosung reported the last invoice number in the INVOICEU field" in the U.S. sales
database.  Hyosung Sec. C Resp. at C-16.

Commerce determined that it was justified in applying an adverse inference because it gave Hyosung "multiple opportunities to remedy these deficiencies, yet [Hyosung] failed to do so.  Commerce determined that, therefore, Hyosung failed to put forth its maximum efforts to comply with requests for information, thereby failing to cooperate to the best of its ability."  *Id.*

### ii.  Parties' Contentions

Hyosung contends that substantial evidence does not support a finding that Hyosung failed to provide or withheld information pursuant to 19 U.S.C. § 1677e(a). Specifically, Hyosung contends that it reported service-related revenues consistent with Commerce's initial instruction to report revenues "*if* the invoices" included the charges, Hyosung's Br. at 3-4, 21-22 (emphasis added), and did not rely on the OAFs because "these documents reflect internal allocations of estimated prices," and Commerce did not instruct Hyosung to "consider internal allocations between affiliates" as revenue, *id.* at 26.[16]  In any event, Hyosung argues, Commerce lacked statutory authority to deduct service-related revenues from the gross unit price based on estimates reported in internal documents exchanged between affiliates.  *Id.* at 35.

Regarding the repeated invoice number, Hyosung contends that it properly reported the invoice in both administrative reviews because the invoice included sales

---

[16] Hyosung asserts that the OAF is an internal budgeting document that it exchanges with its affiliate and the OAF reflects pre-production estimates for various expenses associated with a particular order, which expenses often change between the preliminary issuance of the OAF and the issuance of the invoice to the customer. Hyosung's Br. at 4, 11, 35-36.

that entered the United States in both review periods.[17]  *Id.* at 25.  Regarding the sales

adjustments and discounts, Hyosung states that it reported all price adjustments

consistent with the agency's instructions, considering the definition for "price

adjustments" that the agency provided.  *Id.* at 6-7.  It states that the gross unit prices it

reported "reflected the purchaser's net outlay" because they included the "'discounts' or

other price adjustments negotiated with the customer," *id.* at 7; *see also id.* at 11, and

there were no other adjustments "after the price was set," *id.* at 23.   Regarding the

interest charges, Hyosung states that it reported "the actual amount that the customer

was required to pay."  *Id.* at 38.  Hyosung additionally argues that Commerce acted

contrary to law by failing to comply with the notice requirement of 19 U.S.C. 1677m(d);

substantial evidence does not support a finding that Hyosung failed to act to the best of

its ability; and Commerce's decision to use total AFA is contrary to law.  *See id.* at 19-

44.

As discussed, the Government has requested remand to reconsider the sales-

related revenues issue and otherwise did not substantively respond to Hyosung's

arguments.  *See supra* Discussion Section I.C.

ABB argues that substantial evidence supports Commerce's individual findings,

ABB's Resp. at 23-29, 33-37; Commerce complied with its statutory obligation pursuant

to 19 U.S.C. § 1677m(d), *id.* at 23-29; and Commerce lawfully applied an adverse

---

[17] According to Hyosung, failure to report the invoice in both periods of review under these circumstances would have created a gap in the record in which the invoice was omitted.  *Id.* at 21.  Hyosung avers that Commerce did not articulate how Hyosung failed to comply with a request for information with respect to this issue.  *Id.* at 25.

inference, *id.* at 31-32.  Specifically, ABB contends that Commerce clearly

communicated to Hyosung that it was to report all service-related revenues that were

reflected on any sales documentation, not just the invoices.  *Id.* at 26, 33.  With respect

to the invoice reported in two review periods, ABB contends that, given Hyosung's

description of the sales process, "it should not be possible for a single invoice to cover"

multiple review periods.[18]  *Id.* at 27, 36-37.  ABB further contends that Hyosung was

required to report gross (not net) prices and all price adjustments, including discounts

and rebates, but failed to do so.  *Id.* at 35-36.

> ### iii.  Analysis
>
> > 1.  **Substantial evidence does not support Commerce's findings that Hyosung failed separately to report service-related revenues and failed to act to the best of its ability**

When Commerce finds that a service is separately negotiable, its practice has

been to cap the service-related revenue by the associated expense in its margin

calculations.  *See ABB, Inc. v. United States ("ABB I")*, 41 CIT __, __, 273 F. Supp. 3d

1200, 1208-09 (2017).  When substantial evidence supports a finding that the cost of

the service was separately negotiable from the price of the subject merchandise, the

agency may reduce the export price or constructed export price by the amount of the

expense in question.  *See id.*  On the other hand, "[w]hen substantial evidence does not

support a finding that the cost of the services was separately negotiable from the price

---

[18] ABB also relies on "[o]ther record facts" and justifications as support for Commerce's finding on this issue, ABB's Resp. at 27-28, which the agency did not discuss, *see* I&D Mem. at 30-31.

of the subject merchandise, the agency is without legal authority to reduce export price or [constructed export price] except by the amount of the expense in question." *ABB II*, 355 F. Supp. 3d at 1206, 1220.  In AR3, the court held that Commerce may not "rely on [] internal [company] communications, absent any evidence of communication with the unaffiliated customer, to find that there were additional service-related revenues and expenses that [a company] failed to report." *Id.* at 1219; *see also id.* at 1220 (explaining that "in the absence of [substantial] evidence" to support a finding that a company's "provision of the services in question was separately negotiable with the unaffiliated customer," Commerce lacks a legal basis to reduce the gross unit price).

Substantial evidence does not support Commerce's finding that Hyosung failed separately to report service-related revenues.  Commerce based this finding on the information that appeared in the OAFs.  *See* I&D Mem. at 27-28 (discussing the OAFs); *id.* at 29 ("[I]t is reasonable to conclude based on this record evidence that Hyosung collected service-related revenues in excess of the expenses and that such revenue[s] should be reported and capped.").  While Commerce acknowledged that the OAF is "an internal budgeting document" between Hyosung and HICO America, *id.* at 28, that is not "exchanged between Hyosung and its customer(s)," the agency nevertheless found that the OAF is "part of the sales process and [] clearly based on sales documentation between Hyosung and its customer," *id.* at 27.  The evidence upon which Commerce relied does not support a finding that the services that appeared in the OAF, an internal budgeting document, were separately negotiable with the customer.  *See id.* at 28 & nn.158-161 (citing Hyosung Sec. A Resp. at A-25—A-27).

In its description of the U.S. sales process, Hyosung stated that when HICO

America receives a request for a quote from the customer, HICO America coordinates

with Hyosung to prepare a price quote.  Hyosung Sec. A Resp. at A-24—25.  Hyosung

"rela[ys] to HICO America information regarding the costs associated with producing the

unit" and "[o]nce the design is finalized, HICO America evaluates the total costs . . .

taking into account . . .  oil, transportation, offloading . . . and [] installation," among

other things.  *Id.* at A-25—A-26.  HICO America then determines the "appropriate sales

price for the unit that covers costs and ensures a reasonable profit on the sale," after

which "Hyosung's engineering and HICO America's logistics and sales teams determine

a price for the LPT unit and submit a proposal to the customer."  *Id.* at A-26.  The only

negotiation with which the U.S. customer is involved concerns modifications to the

LPT's design or specifications, corresponding sales price, and delivery terms.  *Id.* at A-

26—27.  After HICO America and the U.S. customer finalize the "design, specifications,

price and delivery terms, the customer [] either execute[s] a sales contract with HICO

America or submit[s] a purchase order to the company."  *Id.* at A-26.  When HICO

America receives a purchase order or a sales contract from a customer, it electronically

issues an OAF to Hyosung, *see id.* at A-26—A-27, and Hyosung then authorizes

commencement of the production of the LPTs, *id.* at A-18.

Hyosung's description of the sales process provides no indication that the

customer separately negotiates service charges that appear on the OAF or that the

OAF is ever exchanged with the customer.  Absent substantial evidence to support a

finding that Hyosung's provision of the services identified in the OAF was separately

negotiable with the unaffiliated customer, Commerce lacked a legal basis to reduce the gross unit price and fault Hyosung for failing to report this information.[19]

In the absence of substantial evidence to support Commerce's reliance on the facts available with respect to service-related revenues, Commerce's finding that this issue supports the use of an adverse inference cannot be sustained.  Based on the foregoing, on remand, Commerce may not rely on the OAFs to apply its capping methodology to service-related revenues and must reconsider its determination to use total facts available with an adverse inference with respect to Hyosung.

### 2. Commerce failed to provide a reasoned explanation for its finding that Hyosung withheld requested information and otherwise impeded the review by providing an overlapping invoice

In reviewing whether substantial evidence supports Commerce's determination, the court asks whether there was "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). This standard requires Commerce to "examine the record and articulate a satisfactory explanation for its action."  *Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013).  While the court will uphold a determination of less than ideal clarity, "the path of Commerce's

---

[19] ABB insists that "[r]ecord evidence shows that the OAF is a direct reflection of the negotiation and assignment of costs and revenues between HICO [America] and the U.S. customer."  ABB's Resp. at 35 (citing I&D Mem. at 28 n.166).  The "evidence" to which ABB cites is Commerce's Issues and Decision Memorandum, which, in itself and without record support (as is the case here), does not constitute substantial evidence.

decision must be reasonably discernable to [the] court." *NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009); *see also CS Wind Vietnam Co., Ltd. v. United States*, 832 F.3d 1367, 1377 (Fed. Cir. 2016) (the agency's experience and expertise are not a substitute for the required explanation).

Commerce preliminarily determined that Hyosung provided one invoice for multiple sales, including one made during the previous period of review.  Prelim. Mem. at 10; Hyosung Prelim. Analysis Mem. at 5-6.  In its case brief to the agency, Hyosung explained:

> The [agency's] standard questionnaire instructed Hyosung to "[r]eport each U.S. sale of merchandise entered for consumption during the [period of review]" and Hyosung confirmed that it "reported U.S. entries of subject merchandise for the review period."  Thus, while a single invoice may relate to multiple entries, the relevant question for identifying the reportable transactions for each administrative review is the timing of the entry into the United States. In this case, *the LPT units on the invoice entered the United States in different [periods of review]*.
>
>         . . .
>
> [T]he different units on the invoice shipped at different times and entered the United States at different times. Due to this difference in shipment timing among the units on the invoice, one unit entered in the last month of the third administrative review period (and therefore was correctly reported in that administrative review), while the other two entered in the first month of the current fourth administrative review period (and therefore were correctly reported in this administrative review). Indeed, Hyosung notes that it is not uncommon for shipment dates to differ for units covered by the same invoice. Many other units subject to this [period of review] were invoiced together but shipped on different days.  The mere fact that the shipment of the units listed on the invoice for [the SEQUs in question] also contained a unit shipped during the prior [period of review] is of no significance, and certainly not grounds for the Department to default to total AFA. There is no great mystery here. . . .

Case Br. of Hyosung Corp. and Req. for Closed Hr'g (Oct. 13, 2017) ("Hyosung Admin.

Case Br.") at 23-24, CR 561, PR 288, CJA Vol. II, Tab 15 (footnotes omitted) (second

alteration in original).[20]

For the final results, Commerce concluded that it was "unclear how multiple sales

could be contained on one invoice" given Hyosung's statement in a questionnaire

response that, for U.S. sales, HICO America "issues the invoice to the unaffiliated

customer when the merchandise is delivered and/or site test is completed."  I&D Mem.

at 30 & n.181 (quoting Hyosung Sec. A Resp. at A-36).  The path to Commerce's

decision that Hyosung withheld requested information on this point and otherwise

impeded the review is not, however, discernable from the explanation the agency

provided.  Commerce's entire analysis of this issue consists of recounting Hyosung's

and ABB's arguments and concluding that "it is unclear how multiple sales could be

contained in one invoice."  *Id.* at 30.  The absence of reasoning is particularly troubling

when it is not clear to the court that there is any inconsistency between Hyosung's use

---

[20] Similarly, before the court Hyosung argues that,

> to the extent that multiple shipments from a single invoice enter the United
> States at the beginning or end of the [period of review], some units from
> that invoice may enter in one [period of review] while other units enter
> during another [period of review].  This situation is not unusual; indeed,
> [ABB's] own submission of factual information made during this
> administrative review of materials submitted in the prior review identified
> sales entering on either side of the [period of review] in the normal course
> of business.

Hyosung's Br. at 2-3 (citing Placement of Admin. Docs. from the 2013/2014 and
2014/2015 Admin. Reviews onto the 2015/2016 R. (Feb. 10, 2017), Attach. 10 at Ex.
S5-21, CR 39-65, PR 75-76, CJA Vol. II, Tab 4).

of the entry date as the linkage to a review period and "delivery and/or site test"

completion as the basis for invoicing.  Without any references or citations to record

evidence, Commerce summarily stated that Hyosung had "multiple opportunities to

clarify the record" on this issue but chose not to do so.[21]  *Id.* at 31.  Commerce's

conclusory statements do not provide substantial record support for its finding pursuant

to section 1677e(a).  ABB's reliance on "[o]ther record facts" and justifications upon

which Commerce did not rely, ABB's Resp. at 27-28, amount to "post hoc

rationalizations for agency action," upon which the court cannot rely to sustain the

agency's decision, *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69

(1962) (the court may only sustain the agency's decision "on the same basis articulated

in the order by the agency itself").

Because Commerce's finding that the use of the facts available based on this

invoice is unsupported by substantial evidence, Commerce's resort to an adverse

inference when selecting the facts available cannot stand.  The court, therefore,

remands this issue for Commerce to reexamine the record and provide a decision that

is supported by a reasonable explanation that is based on record evidence.

---

[21] As discussed, Commerce is without legal authority to resort to facts otherwise available when it fails to comply with section 1677m(d).  *See supra* Discussion Section II.A (explaining the relevant legal framework).  The court cannot conclude, based on Commerce's bare analysis of this issue, that it complied with this statutory directive.

### 3. Commerce's finding that Hyosung failed to report certain price adjustments and discounts must be remanded for further consideration

Applying the legal framework set forth above, the first inquiry is whether

substantial evidence supports Commerce's finding that Hyosung failed to provide

requested information on relevant discounts and price adjustments.  *See* 19 U.S.C.

§ 1677e(a).  The answer to that inquiry is yes.  In Section C of the initial questionnaire,

Commerce instructed Hyosung as follows:

> Report the information requested concerning the quantity sold and the price per unit paid in each sale transaction. All price adjustments granted, including discounts and rebates, should be reported in these fields. The gross unit price less price adjustments should equal the net amount of revenue received from the sale.

Hyosung Initial Questionnaire at C-18 (emphasis omitted).[22]  Regarding payment terms,

the agency instructed Hyosung to explain if the payment terms it offers "are tied . . . to

interest penalties for late payment."  *Id.* at C-17.

Commerce explained that despite these instructions, Hyosung failed to report

properly certain discounts to price and interest revenue, even though Hyosung

acknowledged in its case brief that there were discounts reflected on invoices to the

customer and Hyosung received interest revenue from certain customers.  I&D Mem. at

31-32 & nn.187-188, 191 (citing Hyosung Admin. Case Br. at 25-26).

---

[22] The Glossary defined "price adjustment" as "any change in the price charged for subject merchandise or the foreign like product that is reflected in the purchaser's net outlay."  Hyosung Initial Questionnaire at I-13.  Discounts and rebates are such examples.  *Id.*  "Although the discount need not be stated on the invoice, the buyer remits to the seller only the face amount of the invoice, less discounts."  *Id.*

As it did before the agency, *see* Hyosung Admin. Case Br. at 25-26, Hyosung

argues before the court that the gross unit prices it reported "reflected the purchaser's

net outlay" because they included the "'discounts' or other adjustments negotiated with

the customer," Hyosung's Br. at 7; *see also id.* at 11, and there were no other price

adjustments "after the price was set," *id.* at 23; *see also id.* at 23 ("[R]egardless of

whether the invoice had a separate line item for a discount . . . Hyosung reported the

total amount charged to the customer as the gross unit price.").   Regarding the interest

charges, Hyosung states that it reported "the actual amount that the customer was

required to pay." *Id.* at 38.  Regardless of what Hyosung's understanding was, it is quite

clear that Commerce instructed Hyosung to report gross unit prices (not net prices) and

to report separately any discounts and interest adjustments.  Hyosung Initial

Questionnaire at C-18.  "The mere failure of a respondent to furnish requested

information—for any reason—requires Commerce to resort to other sources of

information to complete the factual record on which it makes its determination." *Nippon

Steel*, 337 F.3d at 1381.  Therefore, Commerce's finding that Hyosung's reporting of

gross unit prices as well as discounts and interest charges was deficient was supported

by substantial evidence.

Nevertheless, Commerce's authority to disregard Hyosung's data and rely on

other sources of information, including its authority to use an adverse inference, is

subject to 19 U.S.C. § 1677m(d).  *See* 19 U.S.C. § 1677e(a),(b).  Pursuant thereto, if

Commerce finds that "a response to a request for information" is deficient, "[it] shall

promptly inform the person submitting the response of the nature of the deficiency and

shall, to the extent practicable, provide that person with an opportunity to remedy or

explain the deficiency in light of the time limits established for the completion of

investigations or reviews." *Id.* § 1677m(d).  ABB contends that Commerce identified a

deficiency and provided Hyosung an opportunity to respond, but cites only the Issues

and Decision Memorandum as support.  ABB's Resp. at 29 (citing I&D Mem. at 31-32).

That Memorandum summarily states that "Hyosung was provided multiple opportunities

to remedy these deficiencies, yet failed to do so," I&D Mem. at 32, without identifying

any such opportunities relevant to this issue.

Commerce's finding that Hyosung failed to act to the best of its ability is similarly

unsupported by substantial evidence and its decision to apply an adverse inference is

otherwise contrary to law.  Commerce relied on its summary reference to multiple

opportunities and went on to state:

> Therefore, Hyosung failed to put forth its maximum efforts to comply with
> requests for information, thereby failing to cooperate to the best of its
> ability. The application of total AFA is, therefore, warranted.

*Id.*  "A finding that simply restates the statutory standard and is unsupported by any

discussion linking the applicable standard to the particular facts is inadequate."  *ABB II,*

355 F. Supp. 3d at 1223.  Therefore, Commerce's resort to facts available, including

with an adverse inference, is unsupported by substantial evidence and otherwise

inconsistent with law.  On remand, Commerce must reconsider this issue and collect or

identify additional information to make a determination supported by substantial

evidence and otherwise in accordance with law.

### 4. Commerce is directed to reconsider its use of total AFA

Because the court remands each of the bases on which Commerce relied to use total AFA, on remand, Commerce must also reconsider or further explain its decision to use total facts available with an adverse inference.

### C. HHI's Motion

#### i. Relevant Facts

For the final results, Commerce explained that it had "considered whether there are components of an LPT that may amount to physical differences in the product such that [the agency] would make an adjustment based on the variance in costs of those components." I&D Mem. at 9. It stated that, "[b]ecause the term 'accessories,' by nature, indicates that these parts may not be essential to LPTs that are subject to the scope of this proceeding," Commerce was concerned that HHI may treat the same parts "as accessories or not as accessories between sales both within each market and across markets," and thereby understate or overstate the gross unit prices, which would manipulate the dumping margin. *Id.* at 10. To address those concerns, Commerce requested information regarding the price and cost for accessories to determine whether accessories should be included or excluded from the gross unit price. *Id.*

Commerce found that, despite its "repeated requests," *id.* at 10 & n.45 (citing Prelim. Mem. at 12-17), HHI failed to provide the information in the form and manner requested and instead relied on the scope language and Commerce's historical treatment of accessories for its reporting methodology, *see id.* at 11. Specifically, Commerce stated that HHI "failed to address which components in its reporting

constitute the accessories [HHI] considers in its normal course of business." *Id.*; *see also id.* at 13 ("[HHI] could have provided the ranges/types of components which it believes constitutes accessories based on its technical knowledge and experience in the industry."). Commerce further stated that HHI provided conflicting responses, because while HHI claimed it did not know the definition of accessories, HHI also claimed that it reported accessories as subject merchandise. *Id.* at 11.

Regarding HHI's reporting of certain home market gross unit prices, Commerce found that HHI's reporting was deficient because HHI used values from its original purchase contract to report gross unit prices even though later-revised contracts identified different contract values. *Id.* at 15. Commerce determined that the record was "ambiguous" whether the product that accounted for the difference in the contract price was subject merchandise (that would have affected the home market gross unit prices) or non-subject merchandise (that would not have affected the home market gross unit prices). *Id.* at 16. Additionally, Commerce expressed "concern that [HHI] might be understating its home market gross unit price[] because it treated the same/similar part differently." *Id.* Specifically, Commerce explained, HHI classified a particular part for one home market sale as non-subject merchandise and classified "the same/similar part" as foreign like product for another home market sale on the record. I&D Mem. at 16 & n.81 (citation omitted). Commerce ultimately concluded that the record was "unclear" regarding these two issues. *Id.* at 17. "In the absence of clear information and explanation," Commerce found "that: (1) [HHI's] reporting of non-foreign like products is inaccurate; (2) there is inconsistent treatment of a certain item in [HHI's]

home market sales; and (3) [exclusion of] this item . . . could lead to the understatement of the home market gross unit price for certain sales." *Id.* at 16.

Regarding the sales agent, Commerce concluded that HHI withheld information and impeded the review because it failed to "disclose the relationship between Hyundai and its sales agent after requests to do so." *Id.* at 4; *see also id.* at 18-19.  Commerce found that "record evidence indicates that Hyundai . . . was affiliated with a certain sales agent in the United States based on the fact that this sales agent uses an email address and a title and a division that belongs to Hyundai."[23] *Id.* at 19 & n.99 (citing HHI Prelim. Analysis Mem. at 5).   Additionally, Commerce determined that HHI "failed to provide complete and accurate information regarding its precise relationship with its sales agent" because it did not provide "conclusive evidence to undermine/challenge Commerce's preliminary finding" of affiliation.  *Id.* at 19.

### ii.  Parties' Contentions

HHI contends that Commerce's findings on each of the three issues lack substantial evidence because HHI fully responded to each of the agency's requests for information on accessories and affiliations, and the agency's finding on the issue of home market gross unit prices was inconclusive.  HHI's Br. at 2-3, 24-26, 30-31, 33-34.

---

[23] Specifically, [[                ]], designated here for confidentiality purposes as "Individual X," of [[                          ]], designated here for confidentiality purposes as "Company Y."  Analysis of Data/Questionnaire Resps. Submitted by Hyundai Heavy Industries Co., Ltd. in the Prelim. Results of the 2015-2016 Admin. Review of the Antidumping Duty Order on Large Power Transformers from the Republic of Korea (Aug. 31, 2017) ("HHI Prelim. Analysis Mem.") at 5, PR 260, CJA Vol. IV, Tab 4.

Additionally, HHI challenges Commerce's decision to apply an adverse inference as contrary to law for failure to comply with 19 U.S.C. § 1677m(d). *Id.* at 26-29, 31, 34-35. HHI further contends that Commerce failed to fulfill its obligations to: (1) define the term "accessories," which was ambiguous; and (2) assist HHI, which was experiencing difficulties in responding to the questionnaires regarding accessories, pursuant to 19 U.S.C. § 1677m(c). *Id.* at 27-29. HHI argues that the agency improperly rejected new factual information that HHI submitted after the preliminary results to address Commerce's preliminary finding on affiliation between HHI and the sales agent. *Id.* at 35-37. Lastly, HHI contends Commerce had no basis for using total AFA. *Id.* at 40-41.

As discussed *supra*, the Government has requested remand to reconsider the accessories issue and otherwise has failed to substantively respond to HHI's arguments. ABB contends that Commerce's findings are supported by substantial evidence and the decision to use total AFA is in accordance with law. *See* ABB's Resp. at 7-21. According to ABB, Commerce's finding with respect to HHI's reporting of home market gross unit prices, alone, supports the use of total AFA. *Id.* at 13-17.

### iii.  Analysis

#### 1.  Commerce's findings that HHI withheld information on accessories and failed to cooperate to the best of its ability are not supported by substantial evidence

Commerce's finding that HHI failed to provide information on accessories despite "repeated requests" by Commerce, I&D Mem. at 10, is not supported by substantial evidence. In its initial antidumping duty questionnaire, Commerce instructed HHI to "separately report the price and cost for . . . 'accessories' to ensure that product

matches are based on accurate physical charateristics [sic] of the LPTs."  Req. for

Information, Hyundai Heavy Industries Co., Ltd. (Jan. 5, 2017) ("HHI Initial

Questionnaire") at D-1, PR 24, CJA Vol. I, Tab 1, Suppl. CJA, Attach. 4.  This was the

same question that the agency posed to HHI in AR3.  *See Hyundai Heavy Indus.*, 332

F. Supp. 3d at 1343.  HHI responded to this request by noting that Commerce had not

defined "accessories" and that HHI reported its accessories consistent with the scope of

the antidumping duty order, which includes accessories in the subject merchandise.[24]

Sections B-D Resp. (Feb. 27, 2017) at D-3, CR 95-150, PR 89-92, CJA Vol. I, Tab 3.

Thereafter, Commerce issued a supplemental sales questionnaire, requesting

HHI to (1) explain whether its sales documentation separately lists or itemizes the price

for accessories, and (2) report separately the revenues and associated expenses for

those accessories.  First Sales Suppl. Questionnaire (Apr. 12, 2017) at 14-15, PR 121,

Suppl. CJA, Attach. 1.  HHI submitted its response on May 3, 2017 and provided the

requested information in worksheet SA-46 "indicating whether any of its sales

documentation separately lists or itemizes values for accessories and the corresponding

expenses for the separately-listed revenues."  Prelim. Mem. at 13 & nn.70-71 (citing

Suppl. A Questionnaire Resp. (May 3, 2017) ("HHI Suppl. A. Resp.") at 41 & Attach. SA-

---

[24] Subsequently, HHI requested the agency to clarify the definition of the term "accessories" as used in the HHI Initial Questionnaire, Req. for Clarification (March 29, 2017) at 5, CR 189-90, PR 117-18, CJA Vol. I, Tab 4, and requested a meeting with Commerce officials to discuss the accessories issue, July 14, 2017 Meeting with Dep't and Resp. to ABB July 12, 2017 Comments on Hyundai's Suppl. Section B-D Questionnaire Resps. (July 25, 2017) ("HHI's July 25, 2017 Cmts.") at 4, CR 520, PR 241, CJA Vol. I, Tab 17.

46, CR 200-265, PR 135-160, CJA Vol. I, Tab 7, Suppl. CJA, Attach. 2).   Commerce

found the worksheet "provide[d] separate line items for various parts and expenses but

[did] not identify which parts of the LPT [HHI] defines and treats as accessories."  *Id.* at

13.  However, the agency did not instruct HHI in this questionnaire to identify *which*

*parts HHI treats as accessories*.[25]  Commerce had not responded to HHI's clarification

request, and HHI reiterated that request in its response.  HHI Suppl. A Resp. at 41.

On May 19, 2017, Commerce issued a second sales supplemental questionnaire

in which it requested additional information on accessories "in light of" HHI's request for

clarification.  *See* Second Sales Suppl. Questionnaire (May 19, 2017) ("HHI Second

Sales Suppl. Questionnaire") at 9, CR 319, PR 168, CJA Vol. I, Tab 8.  Specifically,

Commerce requested HHI to explain how it uses the term "accessories" when it

negotiates with its customers and explain the basis for such usage, describe what HHI

"treat[s] as main bodies, spare parts, and accessories," and, for certain sales, "provide a

chart identifying each component, including main bodies, spare parts, and accessories

for the LPTs sold."  *Id.* at 9-10.  Additionally, Commerce asked HHI to add fields to its

---

[25] In the intervening time between the issuance of the supplemental questionnaire and
HHI's response, HHI and ABB were submitting comments to the agency regarding the
proper definition of accessories.  *See* Pet'r's Resp. to Hyundai's Req. for Clarification of
the Definitions of "Separate Revenue for Sales-Related Services" and "Accessories"
(Apr. 3, 2017), PR 119, CJA Vol. I, Tab 5; Comments on ABB's April 3, 2017 Resp. to
Hyundai's Req. for Clarification of the Definitions of "Separate Revenue for Sales-
Related Services" and "Accessories" (May 1, 2017), PR 131, CJA Vol. I, Tab 6.
Commerce did not respond to HHI's clarification request and the term remained
undefined.

sales databases to report the gross unit price of accessories, both excluding and

including the service-related revenues associated with accessories.  *Id.* at 12.

HHI responded to the agency's second supplemental questionnaire on June 16

and 19, 2017.  HHI explained that it does not have a definition of accessories, that it

"normally mirrors the terminology used by a customer in its request for quotation," and

that its customers and the departments within HHI use the term inconsistently.  2nd

Suppl. Sales Response (Q29 and Q30) and Suppl. D Questionnaire Resp. (Q14) (June

16, 2017) ("June 16th Second Sales Suppl. Resp.") at 2nd SS-3, CR 390, PR 204, CJA

Vol. I, Tab 10.  HHI further explained that, since the original investigation, it has

reported accessories "in accordance with the scope of the antidumping duty order."[26]

*Id.* at SS-8.  Consistent with Commerce's instructions, HHI provided a chart in

Attachment 2nd SS-21, which identified each component for the LPTs sold.   Second

Sales Suppl. Response (June 19, 2017) ("June 19th Second Sales Suppl. Resp.") at 22

& Attach. 2nd SS-21, CR 392-445, PR 207-214, CJA Vol. I, Tab 11, CJA Vol. IV, Tab 2.

Additionally, HHI provided, for each transaction, revenues separately identified in sales

documents for the main transformer, parts and components (including accessories), and

services.  June 19th Second Sales Suppl. Resp., Attach. 2nd SS-24; *see also* Second

Cost Suppl. Resp. (July 24, 2017) at 10, CR 527, PR 244, CJA Vol. I, Tab 16

---

[26] HHI explained that, since the original investigation, it "has reported gross unit prices
that are inclusive of all transformer components that are attached to, imported with, or
invoiced with the active parts of the transformers, including in instances where the sales
documents list individual prices for particular components, in accordance with the scope
of the antidumping duty order."  June 16th Second Sales Suppl. Resp. at SS-8.

(explaining that Attachment 2nd SS-24 included an updated list of items for which

separate revenue was listed in the underlying sales documents).

Commerce took issue with the chart provided in Attachment 2nd SS-21 because

HHI did not identify accessories in the chart.  Prelim. Mem. at 15 & n.85 (citation

omitted).  While the chart listed certain components that included the term "accessory"

in the component name, it only categorized components as main bodies or spare parts

in the "component category" section.  *See, e.g.*, June 19th Second Sales Suppl. Resp.,

Attach. 2nd SS-21 at 2.  This was consistent with HHI's explanations to the agency that

it does not have a definition of accessories, that it normally mirrors the terminology used

by a customer in sales documentation, and that it has consistently reported accessories

based on the scope language.  *See* June 16th Second Sales Suppl. Resp. at 2nd SS-2,

SS-8.

Commerce issued another supplemental questionnaire to HHI on July 11, 2017

and requested that HHI report accessories in a separate field in the cost database "[t]o

the extent that you have reported accessories in your revised sales files."  2nd Section

D Suppl. Questionnaire (July 11, 2017) at 4, CR 484, PR 229, CJA Vol. I, Tab 15.  HHI

responded to this request by referring back to attachment 2nd SS-24 and stating:

> Because the [agency] still is considering the definition of an "accessory," it
> is unclear whether some of these items will ultimately be considered to be
> parts. In the even [sic] that they are and in order to ensure that the
> [agency] has both revenue and cost information for these items, we
> provide in Attachment 2SD-9 a complementary chart in which we have
> reported for each item listed in Attachment 2nd SS-24 . . . the revenue
> listed in that exhibit as well as the cost of the item.

Second Cost Suppl. Resp. (July 24, 2017) at 10, CR 527, PR 244, CJA Vol. I, Tab 16.

HHI provided the worksheet electronically so "the reported costs can be linked to the

COP/CV file by the project code." *Id.* Ten days prior to this response, HHI had met with

Commerce officials and had "offered to supply further information to assist

[Commerce's] understanding of the 'accessories' issues, including, for example, the bills

of materials for the LPTs involved in the reported sales transactions." HHI's July 25,

2017 Cmts. at 5.

      As the above discussion demonstrates, Commerce asked HHI to explain how it

used the term in the ordinary course of business and HHI provided details of the

inconsistent uses within the company and between the company and its customers.

*See* June 16th Second Sales Suppl. Resp. at 2nd SS-2. Commerce determined that

HHI "failed to address which components in its reporting constitute the accessories

[HHI] considers in its normal course of business," I&D Mem. at 11, and that it "could

have provided the ranges/types of components which it believes constitutes accessories

based on its technical knowledge and experience in the industry," *id.* at 13. Commerce

did not provide clear guidance to HHI on how it should report accessories; rather, it

requested a series of explanations, which HHI provided. HHI repeatedly informed

Commerce that its reporting methodology was consistent with the scope of the

antidumping duty order and repeatedly requested guidance from Commerce on the

definition of accessories. *See* Req. for Clarification; HHI Suppl. A Resp. at 41.

      In *Hyundai Heavy Industries*, the court stated that "HHI's interpretation of the

term [accessories] as excluding transformer parts that physically attach to an LPT was

reasonable and otherwise appears to comport with the scope of the order and with

Commerce's instructions."  332 F. Supp. 3d at 1347 (citation omitted).  So too was

HHI's understanding of the term here.  That HHI's reporting was reasonable is further

demonstrated by the agency's own decision in the remand redetermination in AR3,

which it issued after the *Final Results*.  Therein, Commerce stated that it now "agree[s]

with [HHI's] reporting that 'accessories' are components attached to the active part of

the LPT and included within the subject merchandise."  Final Results of

Redetermination Pursuant to Court Remand at 9, *Hyundai Heavy Indus. Co., Ltd. v.

United States*, No. 17-00054 (CIT Dec. 13, 2018), ECF No. 66.  According to

Commerce, therefore, "defining 'accessories' or characterizing parts or components as

'accessories' is no longer relevant for purposes of Commerce's determination," *id.* at 10;

"Hyundai did not fail to act to the best of its ability regarding 'accessories'" and "applying

AFA to Hyundai with respect to 'accessories' [is] no longer warranted,"[27] *id.* at 19.

In light of the foregoing, Commerce's findings that HHI failed to provide

requested information on accessories and failed to act to the best of its ability is

unsupported by substantial evidence.[28]  Accordingly, Commerce's decision to apply an

adverse inference was not in accordance with law.

---

[27] Although *Hyundai Heavy Industries* concerned a separate administrative record, the records are not materially distinguishable with respect to accessories.  *See* Oral. Arg. at 11:57-12:31.

[28] In *Hyundai Heavy Industries*, the court stated that "[i]f Commerce is to take an action adverse to a party for an alleged failure to comply with an information request, it must fulfill its own responsibility to communicate its intent in that request."  332 F. Supp. 3d at 1348 (quoting *Prosperity Tieh Enter. Co. v. United States*, 42 CIT__, __, 284 F. Supp.

      **2.**  **Substantial evidence supports Commerce's finding that the record was unclear whether HHI properly reported home market prices; however, Commerce must reconsider its decision to apply an adverse inference**

In its initial questionnaire, Commerce requested HHI to "[p]rovide . . . all sales-related documentation generated in the sales process . . . for a sample sale in the foreign market and U.S. market during the [period of review]."  HHI Initial Questionnaire at A-10.  HHI provided the requested information on February 2, 2017.  *Id.* at 16 & n.85 (citing Sec. A Resp. (Feb. 2, 2017) ("HHI Sec. A Resp."), Attachs. A-13—A-15, CR 19-38, PR 42-50, CJA Vol. I, Tab 2, CJA Vol. IV, Tab 1, Suppl. CJA, Attach. 5).  In a supplemental questionnaire, Commerce asked HHI to provide "complete sales and expenses documentation" for five home market sales and five U.S. sales.  HHI Second Sales Suppl. Questionnaire at 13.  Commerce also requested "a complete break-down between foreign like product and non-foreign like product" and "a detailed narrative explanation and supporting documentation demonstrating why you categorized such products shown in the identified document as foreign like product and non-foreign like product, respectively."  *Id.* at 10-11.[29]  HHI timely responded to these requests.  I&D Mem. at 17 & n.88 (citation omitted).

_____

3d 1364, 1381 (2018)).  In this case, it is difficult to see how HHI can be said to have failed to put forth its maximum effort when it responded to each of Commerce's questions, made multiple requests for clarification, requested a meeting with Commerce officials to discuss the issue, and provided sales and cost information for the parts and components that the agency presumably could have used once it determined the definition of accessories.

[29] HHI averred that Commerce "did not identify which 'certain item' it believed was subject merchandise in one sale, but non-subject merchandise in the other sale."  HHI's

For the preliminary results, Commerce found that HHI "improperly reported its home market gross unit prices for certain home market sales" because HHI used values from its original purchase contract to report gross unit prices "even though later-revised contracts identify different contract values."   Prelim. Mem. at 18 & n.104 (citing 2nd Suppl. Sales Resp. to Questions 42, 47-50, 52, 54, 55, and 77 (June 26, 2017) ("June 26th Second Sales Suppl. Resp."), Attach. SS-94, CR 460-82, PR 222-24, CJA Vol. I, Tabs 13, 14, CJA Vol. IV, Tab 3).   Commerce further found that HHI had not demonstrated that the gross unit prices it reported remained unchanged.   HHI Prelim. Analysis Mem. at 3.  Following the preliminary results, HHI submitted comments asserting that the agency made an erroneous finding.  *See* Resubmission of Post-Prelim. Comments (Oct. 5, 2017), Attach. at 4-5, CR 560, PR 281, CJA Vol. I, Tab 22. HHI identified record evidence that it claimed demonstrated that revisions to the purchase contract related to a part that was non-subject merchandise and did not affect the gross unit prices of foreign like product.  *Id.*

---

Br. at 16.  While Commerce did not identify the part, it cited the specific pages of ABB's rebuttal brief, which make clear that Commerce was referring to the [[

    ]].   Specifically, ABB claimed that

[[


              ]]" as non-subject merchandise. Under no classification system would a [[
            ]] be deemed non-subject merchandise. Hyundai confirmed this usage by reporting that the [[


      ]].
Pet'r's Rebuttal Br. to Hyundai's Case Br. at 19-20 & n.69 (citing HHI's June 19th Second Sales Suppl. Resp., Attach. SS-21 at ECF p. 86).

Commerce concluded that the record was "ambiguous" whether the part

accounting for the difference in price was subject merchandise.  I&D Mem. at 15-16.

Commerce, however, appears to have related the ambiguity associated with this

particular part, whether foreign like product or non-foreign like product, with its inability

to determine whether certain parts or components are "accessories."  *Id*.  The ambiguity

was also due to the fact that the initial contract listed the particular part under the "Main

Transformer" description.  *Id.* at 15 & n.79 (citing Pet'r's Rebuttal Br. to Hyundai's Case

Br. (Oct. 19, 2017) at 19, CR 566, PR 294, CJA Vol. I, Tab 25; June 19th Second Sales

Suppl. Resp., Attach. 2nd SS-22).  Because Commerce's decision with respect to this

issue appears to be linked to its treatment of accessories, which treatment Commerce

must revisit, the court defers ruling on this issue pending Commerce's redetermination

on remand.  In that redetermination, if Commerce continues to find fault with HHI's

reporting of the gross unit prices for these particular home market sales, or its treatment

and reporting of a particular part as between the U.S. and home markets, Commerce

must clearly explain the basis for each finding and any extent to which the finding

supports the use of any facts available, with or without an adverse inference.

### 3. Substantial evidence does not support Commerce's finding that HHI failed to disclose its affiliation with a sales agent

As stated, the substantial evidence standard of review requires that Commerce

"examine the record and articulate a satisfactory explanation for its action."  *Bestpak*,

716 F.3d at 1378 (Fed. Cir. 2013).  Commerce has failed to do so with respect to its

treatment of an allegedly affiliated sales agent.

Commerce concluded that HHI withheld information and impeded the review because it failed to disclose HHI's affiliation with a "sales agent."  *See* I&D Mem. at 4, 19 & n.99 (citation omitted); HHI Prelim. Analysis Mem. at 5.  It is unclear, however, whether "sales agent" constitutes a reference to Individual X or Company Y.  In fact, Commerce appears to refer to Individual X and Company Y interchangeably through the use of the "sales agent" moniker.  In one instance, Commerce agreed with ABB's allegation that HHI was affiliated with Company Y.  *See* Prelim. Analysis Mem. at 4 ("[ABB] alleged the possibility of affiliation between Hyundai and one sales agent (i.e., [Company Y])"); *id.* at 5 ("[R]record evidence indicates that Hyundai is affiliated with the sales agent in the United States, as the petitioner alleged.") (footnote omitted).  In another instance, Commerce found that "th[e] sales agent [Individual X of Company Y] is affiliated with HHI."  *Id.* at 5.

HHI disclosed Company Y as a sales agent in its initial questionnaire response and claimed to be unaffiliated with the company.  Sections B-D Resp. at C-45, CJA Vol I Tab 3.  In a supplemental questionnaire, Commerce requested the following: "Petitioner noted that publicly available information shows, for example, that commission agent [Company Y] shares the same address and phone number with [[

                        ]].  Please explain [HHI's] relationship with this company and state whether there is any affiliation between [Company Y] and any [HHI] entity."  HHI Second Sales Suppl. Questionnaire at 30.  In response, HHI reiterated that it had no affiliation with any of its sales agents; that it compensates them whenever they "are able to arrange a sale;" and, regarding Company Y, that it has "no ownership interest in the company,

which is privately held."  June 19th Second Sales Suppl. Resp. at 81.  HHI also

provided documentary evidence regarding Company Y's correct address.  June 19th

Second Sales Suppl. Resp. at 81 (citing June 19th Second Sales Suppl. Resp., Attach.

2nd SS-89).  HHI, therefore, addressed Commerce's question to describe in detail its

relationship with its sales agents, including Company Y.[30]

Commerce determined that HHI and the "sales agent" were affiliated pursuant to

19 U.S.C. §§ 1677(33)(D) and (E), but did not specify whether it meant Individual X or

Company Y.  *See* I&D Mem. at 4.  Those statutory provisions, respectively, provide that

an "[e]mployer and employee" and "[a]ny person directly or indirectly owning,

controlling, or holding with power to vote, 5 percent or more of the outstanding voting

stock or shares of any organization and such organization" "shall be considered to be

affiliated."  19 U.S.C. §§ 1677(33)(D),(E).  The only explanation that Commerce gave to

support its finding of affiliation is "the fact that [Individual X] uses an email address and

a title and a division that belongs to [HHI]."  I&D Mem. at 19 & n.99 (citing HHI Prelim.

Analysis Mem. at 5).[31]  Commerce did not, however, explain how that "fact" fulfilled the

---

[30] ABB argues that HHI failed to fully and accurately respond to Commerce's
supplemental questionnaire because HHI did not mention Individual X or the fact that
this individual "uses an HHI title and email address."  ABB's Resp. at 19.  According to
ABB, "[t]he agent's title alone should have caused [HHI] to comment on or further
explain the nature of the agent's role with [Company Y] and HHI."  *Id.*  This argument is
unpersuasive because ABB fails to identify any specific requests for information in the
questionnaire that required HHI to address employees of its sales agents, their titles, or
email addresses.

[31] Although HHI presented several arguments with respect to Commerce's preliminary
affiliation finding, *see* Hyundai's Case Br. (Oct. 12, 2017) at 44-47, CR 564, PR 289,
CJA Vol. I, Tab 23, Commerce did not analyze those arguments but determined that

statutory definition of affiliation pursuant to section 1677(33)(D). *See* I&D Mem. at 19.

Commerce also failed to identify any evidence supporting its finding of affiliation

pursuant to section 1677(33)(E). *See id*.

"Commerce must explain the basis for its decisions," such that "the path of

Commerce's decision [is] reasonably discernable to a reviewing court." *NMB*

*Singapore*, 557 F.3d at 1319. Because Commerce did not do so, the court will remand

this matter to the agency to reconsider and further explain the basis for its decision that

HHI was affiliated with a sales agent pursuant to sections 1677(33)(D) and (E).[32]

In the absence of substantial evidence to support Commerce's use of facts

available, Commerce's reliance on an adverse inference also cannot be sustained.

### 4. Commerce is directed to reconsider its decision to use total AFA

In this case, Commerce disregarded HHI's data based on the three collective

findings discussed above. Because substantial evidence does not support those

findings, Commerce's decision to use total AFA as a result of these three findings is

likewise unsupported by substantial evidence. On remand, Commerce must reconsider

or further explain its decision to use total facts available with an adverse inference.

---

HHI did not "conclusive[ly]" challenge Commerce's preliminary finding, I&D Mem. at 19. Commerce must address those arguments upon reconsideration on remand.

[32] HHI claims that Commerce's statement in the preliminary results that the sales agent's email address "belongs" to HHI constituted new factual information – i.e., a statement of fact. HHI's Br. at 35-36. Commerce made the statement as a finding based on its review of Attachment SA-15. I&D Mem. at 19 & n.99 (citing HHI Prelim. Analysis Mem. at 5). HHI may disagree whether that finding is supported by substantial evidence; however, this finding does not constitute new factual information to which HHI was entitled to respond.

III.    **Iljin's Motion for Judgment on the Agency Record**

   **A.  Legal Framework**

There is no statutory provision that directly addresses how Commerce is to

determine the dumping margin for non-examined companies in an administrative

review.  However, 19 U.S.C. § 1673d(c)(5) addresses such determinations in

investigations and Commerce uses this provision as a guide for determining dumping

margins for non-examined companies in a review.  *See, e.g.*, *Albemarle Corp. v. United

States*, 821 F.3d 1345, 1352 & n.6 (Fed. Cir. 2016); *Prelim. Results,* 82 Fed. Reg. at

42,290.  It provides that the "all-others rate" assigned to non-examined companies is

determined as "the weighted average of the estimated weighted average dumping

margins" assigned to individually-examined companies, "excluding any zero and de

minimis margins, and any margins determined entirely under section 1677e of this title

[i.e., on the basis of the facts available, including adverse facts available ("AFA")]."  19

U.S.C. § 1673d(c)(5)(A).  If, however, the dumping margins assigned to all individually-

examined companies are zero, de minimis, or based on adverse facts available,

Commerce "may use any reasonable method to establish the estimated all-others rate

for exporters and producers not individually investigated, including averaging the

estimated weighted average dumping margins determined for the exporters and

producers individually investigated."  *Id.* § 1673d(c)(5)(B).

The Statement of Administrative Action accompanying the Uruguay Round

Agreements Act[33] provides that when the dumping margins for all individually-examined

respondents "are determined entirely on the basis of the facts available or are zero or

de minimis[,] . . . Commerce may use any reasonable method to calculate the all others

rate."  Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc.

No. 103–316, vol. 1, at 873 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4201 ("SAA").

While

> the expected method in such cases will be to weight-average the zero and
> de minimis margins and margins determined pursuant to the facts
> available, provided that volume data is available[,] . . . if this method is not
> feasible, or if it results in an average that would not be reasonably
> reflective of potential dumping margins for non-[examined] exporters or
> producers, Commerce may use other reasonable methods.

*Id.*

### B.  Relevant Facts

For the preliminary results, Commerce applied to Iljin the rate preliminarily

assigned to Hyosung and HHI.  *Prelim. Results,* 82 Fed. Reg. at 42,290 & n.4 (citing

*Albemarle*, 821 F.3d 1345).  Commerce explained that the rate represented "the only

rate determined in this review for individual respondents and, thus, should be applied to

the [non-examined respondents]."  *Id.* at 42,290.  In its administrative case brief, Iljin

argued that the 60.81 percent rate was not "reasonably reflective of [its] potential

dumping margin[]," *see* Case Br. of Iljin (Oct. 12, 2017) at 6, PR 287, CJA Vol. III, Tab

12, and Commerce should instead assign it the 2.99 percent weighted-average

---

[33] The SAA is the authoritative interpretation of the statute.  19 U.S.C. § 3512(d).

dumping margin Iljin received in AR3, *id.* at 8.  After determining to retain the 60.81

percent rate for HHI and Hyosung, Commerce continued to assign that same rate to Iljin

for the final results.  I&D Mem. at 35.  Impliedly referencing the rate as the simple

average of the rates assigned to the examined respondents, Commerce explained that

its methodology is supported by the statute and the SAA and was "upheld in *Albemarle*."

*Id.*

### C.  Parties' Contentions

Iljin contends that Commerce assigned it a margin that is "[i]nconsistent with the

[l]aw" and unsupported by record evidence.  Iljin's Br. at 6.  Specifically, Iljin contends

that Commerce is required to assign it a margin that is "reasonably reflective of potential

dumping margins," and *Albemarle* does not support Commerce's conclusion that the

AFA rates assigned to the examined respondents reasonably reflect Iljin's potential

dumping margin.  Iljin's Br. at 6-8; Iljin's Reply at 2.  Iljin seeks to distinguish *Albemarle*,

arguing that the Federal Circuit's decision turned on the fact that the examined

respondents received calculated rates "reflect[ing] pricing activity during the [relevant]

review period" and, thus, "the examined respondents' rates" reasonably reflected "the

non-examined respondents' potential margins."  Iljin's Reply at 2-3 & n.4 (citing

*Albemarle*, 821 F.3d at 1351).  Iljin further argues that *Bestpak* requires Commerce to

assign non-examined respondents a rate that reflects those companies' "economic

reality."  Iljin's Reply at 3 & n.5 (citing *Bestpak*, 716 F.3d at 1378).

ABB contends that the logic and holding of "*Albemarle* applies equally to both de

minimis and AFA margins."  ABB's Resp. at 41 ("As with de minimis margins,

Commerce has no mandate under [section] 1673d(c)(5)(B) 'to routinely exclude' the

AFA margins. . . .").  ABB further contends that the record supports Commerce's finding

that the 60.81 percent margin is reasonably reflective of Iljin's potential dumping margin

for this period of review.  *Id.* at 42-46.

### D.  Analysis

Commerce determined Iljin's rate by taking the simple average of the AFA rates

assigned to the examined respondents.  *See* I&D Mem. at 35.  Because the court

remands Commerce's decision to rely on AFA to determine the mandatory respondents'

dumping margins, on remand, Commerce may determine not to use AFA to determine

the rates applicable to both Hyosung and HHI, making this issue moot.  Therefore, the

court defers consideration of Commerce's method of selecting the rate assigned to Iljin

pending the agency's redetermination on remand.

## IV.   ABB's Requests

ABB avers that "any remand in this case would require Commerce to consider all

of the issues that were briefed by ABB before the agency but were deemed to be moot

once Commerce applied adverse facts available to Hyundai and Hyosung on other

grounds."  ABB's Resp. at 39 (citing I&D Mem. at 19-20, 32).  ABB requests that the

court "direct Commerce to consider the additional issues raised by ABB in support of

the application of total adverse facts available to each respondent because those issues

would no longer be moot."  *Id.*  While it is within Commerce's discretion to reconsider

these issues on remand, the court declines to order Commerce to do so.  *See*

*Torrington Co. v. United States,* 14 CIT 56, 57, 731 F. Supp. 1073, 1075-77 (1990)

("[A]n intervenor is limited to the field of litigation open to the original parties, and cannot enlarge the issues tendered by or arising out of plaintiff's bill.") (citing *Chandler & Price Co. v. Brandtjen & Kluge, Inc.*, 296 U.S. 53, 58 (1935)).

CONCLUSION

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's *Final Results* are remanded to Commerce; and it is further

**ORDERED** that, on remand, Commerce shall:

(1) Redetermine the rate to be applied to Hyosung:

    a.  Without relying on the OAFs as the basis for applying its capping methodology to service-related revenues;

    b.  Based upon a reconsideration of Hyosung's overlapping invoice consistent with this Opinion; and

    c.  Based upon a reconsideration of Hyosung's price adjustments, discounts and interest charges consistent with this Opinion;

(2) Redetermine the rate to be applied to HHI:

    a.  Based upon a reconsideration of HHI's reporting of accessories consistent with this Opinion;

    b.  Based upon a reconsideration of its HHI's reported home market gross unit prices consistent with this Opinion; and

    c.  Based upon a reconsideration of HHI's reported sales agent, consistent with this Opinion; and

(3) Redetermine, as appropriate, the rate applied to Iljin;

**ORDERED** that Commerce shall file its remand results on or before

November 4, 2019; and it is further

**ORDERED** that subsequent proceedings shall be governed by USCIT Rule

56.2(h); and it is further

**ORDERED** that any comments or responsive comments must not exceed 5,000

words.


                                        /s/      Mark A. Barnett____
                                        Mark A. Barnett, Judge

Dated: August 5, 2019____
          New York, New York